AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

03/21/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:     DM       DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No. 2:21-mj-01395 |
| SAMUEL TITUS MBAT-ESSIEN, | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 19, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1542 | Use of a Passport Secured by False Information |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/S/ DOULGAS WON CHOI*
*Complainant's signature*

Douglas Won Choi, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Date: March 21, 2021

*Judge's signature*

City and state:   Los Angeles, California

Hon. Gail Standish, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Douglas Won Choi, being duly sworn, declare and state as follows:

## I.  **PURPOSE OF AFFIDAVIT**

1.  This affidavit is made in support of a criminal complaint and arrest warrant against Samuel Titus Mbat-Essien ("MBAT") for a violation of Title 18, United States Code, Section 1542 (Use of a Passport Secured by False Statement).

2.  This affidavit is also made in support of an application for a warrant to search the following eight digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Homeland Security Investigations ("HIS"), in Los Angeles, California, as described more fully in Attachment A:

a.  A black Apple iPhone XR, IMEI: 3564331090500008 ("SUBJECT DEVICE 1");

b.  A pink Apple iPhone 6S, IMEI: 355693071754702 ("SUBJECT DEVICE 2");

c.  A black with gold case Apple iPhone, IMEI: 355829082069165 ("SUBJECT DEVICE 3");

d.  A navy case Apple iPhone XR, IMEI: 356428108366066 ("SUBJECT DEVICE 4");

e.  A black iPhone 12, IMEI: 35304011336194 ("SUBJECT DEVICE 5");

f.  A purple with blue case Apple iPhone XR, IMEI: 356432106659191 ("SUBJECT DEVICE 6");

g.  A Samsung Galaxy Note 8, IMEI: 351824091392017 ("SUBJECT DEVICE 7"); and

h.   A metallic colored LG Phone ("SUBJECT DEVICE 8").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 8, United States Code, Section 1326 (Illegal Alien Found in the United States Following Deportation), and Title 18, United States Code, Sections 1542 (Use of a Passport Secured by False Statement), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1028A (Aggravated Identity Theft), and 1956 (Money Laundering) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.   I am a Special Agent ("SA") with HSI, United States Department of Homeland Security, and have been employed as a Special Agent with HSI since May of 2018.  I am currently assigned to the Los Angeles International Airport ("LAX").  I am

a graduate of the Federal Law Enforcement Training Center located in Glynco, Georgia, and Artesia, New Mexico.  I have been trained in investigative techniques, interviewing techniques, court procedures, and federal administrative and criminal laws.  Prior to being an SA with HSI, I was a Border Patrol Agent with Customs and Border Protection ("CBP") from August 2011 to May 2018.  As a Border Patrol Agent, I participated in the interdiction, arrest, and investigation of criminal entities that committed crimes involving immigration violations within the United States.  As a Border Patrol Agent, I received specialized training regarding identification and travel documents commonly found at the U.S. border or U.S. ports of entries.

6.    As an HSI SA assigned to LAX, I have worked closely with CBP and other law enforcement entities within LAX to conduct investigations pertaining to crimes that occur within the LAX port of entry.  Such investigations include, but are not limited to, immigration, customs, fraud, financial crimes, narcotics, and national security related investigations. Additionally, as a member of the Border Enforcement Security Task Force, I have worked at the International Mail Facility, which identifies and intercepts inbound and outbound parcels and packages of various international sources that contain contents contrary to U.S. laws or items that are prohibited in the U.S., including fraudulent or illegitimate identification and travel documents.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On March 19, 2021, MBAT was encountered by CBP Officers at LAX, gate 150, prior to boarding Royal Dutch Airlines Flight KL-602 bound for Dubai via Amsterdam.  MBAT was traveling using a U.S. passport bearing the name K.R.R.  CBP had identified K.R.R. because a law enforcement database search revealed multiple possible identities affiliated with K.R.R.[1] CBP officers conducted an outbound inspection of MBAT, during which MBAT presented himself as a citizen of the U.S. with a valid U.S. Passport bearing K.R.R.'s name.  CBP officers conducted further checks, including a fingerprint scan, which revealed that Samuel Titus Mbat-Essien (MBAT) is the real identity of K.R.R.  CBP officers searched MBAT and his belongings and seized numerous fraudulent identification documents bearing names other than MBAT's, including one U.S. Passport, one U.S. Passport Card, two Massachusetts state driver's licenses, and one birth certificate bearing the name K.R.R., in addition to one social security card, one California state driver's license, and numerous debit/credit cards in various other names.  CBP officers also seized eight cellphones, approximately $80,000 in U.S. and foreign currency, and a notebook.

8.   HSI SA Jorge Marron and I arrived and interviewed MBAT.  We advised MBAT of his <u>Miranda</u> rights, and he agreed to waive his rights and speak with us.  During the interview, MBAT

---

[1] The victim is referred to herein by his initials because he is believed to be a real person.

admitted, among other things, that he is not K.R.R.  MBAT
further admitted that he had obtained the documents bearing the
name K.R.R. by purchasing K.R.R.'s identity on the black market
using a dark web type vendor.  MBAT admitted that after he
purchased the identity of K.R.R., he used the identity to obtain
numerous identification documents, including the U.S. Passport,
U.S. Passport Card, two driver's licenses, one social security
card, and one birth certificate.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.    CBP Outbound Inspection of MBAT**

10.   Typically, airlines require international travelers to
check in for their flights using a passport or similar travel
document.  When international travelers pass through airport
security, they are required to present to airport security
officers a boarding pass in addition to a passport or similar
identification document.  Before international travelers board
their planes for departure, they are again required to present
to airline staff a passport or similar identification document
along with their boarding pass.

11.   On March 19, 2021, MBAT was encountered by CBP
Officers at LAX, gate 150, prior to boarding Royal Dutch
Airlines Flight KL-602 bound for Dubai via Amsterdam.  MBAT was
traveling using a U.S. passport bearing the name K.R.R.  CBP had
identified K.R.R. because a law enforcement database search

revealed multiple possible identities affiliated with K.R.R.
CBP officers conducted an outbound inspection, during which MBAT
presented himself as a citizen of the U.S. with a valid U.S.
passport, bearing number 653105479 and the name K.R.R.  CBP
officers detained MBAT for further investigation.

12.   CBP officers conducted an administrative inspection of
MBAT's belongings and searched his person, luggage, and other
personal items.  During the inspection, CBP officers found
numerous identification documents, including a U.S. passport,
U.S. passport card, multiple driver's licenses, a birth
certificate, social security cards, a notebook, eight cellphones
(the SUBJECT DEVICES), approximately $80,000 in U.S. and foreign
currency, multiple debit/credit cards, and several business
cards.

13.   CBP officers noticed that these identification
documents bore several different names other than MBAT's,
including K.R.R., S.E., K.B.G., J.W., W.H., and other variations
of these names.

14.   Based on the many different names reflected on MBAT's
identification documents, CBP officers believed that MBAT was
engaged in identity fraud.  CBP officers asked MBAT to provide
his real name.  MBAT admitted to CBP officers that K.R.R. was
not his true identity and said that his real name is Samuel
Titus Mbat-Essien.  CBP officers conducted a fingerprint scan,
which confirmed MBAT's true identity.

15.   Based upon their findings, CBP officers detained MBAT along with the documents, cellphones, debit/credit cards, business cards, and other personal effects.

16.   CBP officers asked MBAT about the eight cellphones (the SUBJECT DEVICES) they had found.  MBAT confirmed that the SUBJECT DEVICES belonged to him but refused to provide officers with the passcodes.  CBP officers searched through a notebook found in MBAT's belongings and discovered what appeared to be several passcodes.  CBP officers tested a passcode written in the notebook, which unlocked one of MBAT's phones.

17.   CBP officers counted the U.S. and foreign currency found in MBAT's belongings and estimated the total value to be approximately $80,000.  MBAT had filled out a customs declaration form declaring only $65,000 USD.

18.   CBP officers notified me of their investigation into MBAT, and I met with CBP officers in the secondary inspection area of the terminal.

**B.   MBAT Records Checks and Post-<u>Miranda</u> Interview**

19.   I conducted records checks based on the information I received regarding MBAT.  The records checks revealed that MBAT is a Nigerian citizen and not a U.S. citizen.  A search of MBAT's Alien Number revealed an immigration detainer that had been placed on MBAT while he was serving a prior prison sentence for bank fraud.  After MBAT completed his sentence, he was removed from the United States to Nigeria on approximately February 10, 2004.  MBAT appears to be in the U.S. illegally.

20.   SA Marron and I interviewed MBAT.  We advised MBAT of his <u>Miranda</u> rights, and he stated that he understood his rights and agreed to waive them to speak with us.  During the interview, MBAT admitted that K.R.R. is not his real name.  MBAT further admitted that he had obtained K.R.R.'s identity by purchasing it on the black market using a dark web type vendor.

21.   MBAT said that once he had obtained the identity and biographical information of K.R.R. he used it to procure many of the other fraudulent identity documents in his possession, including one social security card, two Massachusetts driver's licenses, one birth certificate, one U.S. Passport, and one U.S. Passport Card, all in K.R.R.'s name.

22.   Specifically, MBAT admitted that he first procured a social security card in K.R.R.'s name, and he then used that social security card to obtain the other identification documents by applying for them from the U.S. government utilizing certain contacts and vendors.  MBAT stated that he knew various contacts and vendors who are in the business of selling identities and assisting others in fraudulently obtaining various identification documents issued by the U.S. MBAT estimated the total cost of K.R.R.'s identity and corresponding documents was approximately $20,000.  MBAT stated that he used bitcoin to make the purchase.

23.   MBAT admitted that one of the driver's licenses in his possession is not genuine.  He admitted that the social security card, birth certificate, U.S. Passport, and U.S. Passport card were genuinely issued by the U.S. but were fraudulently obtained

using the identity of K.R.R.  MBAT admitted that he had applied
for the U.S. passport in Massachusetts.

24.  MBAT said that he was familiar with the business of
selling identities and had himself engaged in such business.
MBAT explained that the business of selling identities is
lucrative and widespread.  MBAT said that he is aware of
multiple entities that participate in the trade, sale, and
procurement of identities, specifically U.S. identities.  MBAT
stated that he is aware of many fugitives and individuals with
sordid pasts that use these fraudulent identities to evade
detection by law enforcement and to freely move throughout the
country and abroad.

25.  MBAT further stated that he had previously been
convicted of crimes in the U.S.  MBAT provided an overview of
his criminal history that mirrors MBAT's actual criminal
history.  MBAT also said that he served approximately 43 months
in prison for a federal bank fraud conviction.  MBAT admitted
that he had been removed from the U.S. to Nigeria after he
completed his sentence for that conviction in 2004.  MBAT
confirmed that he is a Nigerian citizen and not a U.S. citizen.
Due to his removal, MBAT stated that he had no legitimate way of
returning to the U.S.

26.  MBAT further admitted that he had reentered the U.S.
in approximately 2018 and had been here ever since.
Specifically, MBAT said that he entered Canada using his
Nigerian Passport and obtained a Canadian visa.  He then entered

the U.S. from the Canadian border.  MBAT said that he used
trustworthy border crossers to assist his crossing.

27.  MBAT further admitted that he purchased the identity
of K.R.R. so that he could move and travel freely within the
U.S. and abroad.  Given his own criminal history, MBAT wanted an
identity free of any criminal history.  MBAT said that he almost
declined to purchase the identity of K.R.R. because the real
K.R.R. had sustained a driving infraction, which was reflected
on his record.  MBAT admitted that he paid off the infraction so
that the identity of K.R.R. would be "clean."  MBAT further
admitted he had used the K.R.R. related documents to travel
freely throughout the U.S. without fear of detection by law
enforcement.  When asked how many other identities he had used
in the past, MBAT said he had used three to four identities.

28.  MBAT explained that U.S. travel documents also allow
for travelers to navigate areas in Europe and Africa with ease.
MBAT stated that his trip to Dubai via Amsterdam was the first
time he would have used the passport bearing the name K.R.R. to
travel internationally.

29.  When asked about the large amount of cash he was
carrying, MBAT admitted that he is a money courier and a trader
of bitcoin.  MBAT said that he would exchange bitcoin for
currency and deliver the currency to those who requested his
services.  MBAT admitted that he provided this service to both
legitimate and illicit entities.  Furthermore, MBAT explained
that he was supposed to provide approximately $50,000 to an
Asian man around La Puente or the City of Industry, but he never

met the man.  MBAT then received a request to deliver that money and more to an individual in Dubai.  Due to the short notice of the request, MBAT said that he did not have a chance to exchange the $50,000 into bitcoin, and that is why he was in possession of such a large amount of U.S. and foreign currency.

30.  MBAT stated that he knew of an organization in Toronto, Canada, which specializes in providing fraudulent identities.  He said that he knew two brothers associated with that entity who provide these services in addition to other fraudulent activities.  MBAT stated that the brothers were currently in jail due to their activities.  SA Marron conducted an open source search for the names of the brothers MBAT provided, which resulted in news articles pertaining to arrests linked with those names.

31.  MBAT explained that these services are often provided on the dark web through apps such as WhatsApp, Telegram, and Signal.  MBAT further explained that those who participate are tech savvy individuals who are experts at hiding their identities and internet footprints by using VPNs and monikers. MBAT said these individuals would "disappear" once they realized an associate had been arrested by law enforcement.

32.  MBAT said that he could show SA Marron and me how to purchase such identities using the dark web and provided us with further detailed instruction and guidance.

33.  MBAT said that he has multiple digital wallets containing bitcoin.  MBAT also admitted that he has bank

accounts under the identity of K.R.R. at TD Bank, Bank of America, Chase, and Capital One.

## V. TRAINING AND EXPERIENCE IDENTITY THEFT, PASSPORT FRAUD, ACCESS DEVICE FRAUD, AND MONEY LAUNDERING

34.  Based on my training and experience and information obtained from other law enforcement officers who investigate fraud and identity theft crimes, I know the following:

a.  People involved in passport fraud, identity theft, access device fraud, and money laundering crimes often collect checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents belonging to other people that they can use to fraudulently obtain money and items of value.  It is a common practice for those involved in such crimes to use either false identification or stolen real identification to make purchases with stolen access devices at in order to avoid detection and to complete the transaction. Those who engage in such fraud keep evidence of such fraudulent transactions, including on their digital devices.

b.  It is common for identity thieves, and individuals engaged in passport fraud, access device fraud, and money laundering to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  Software relevant to such schemes can often be found on digital devices.  Such

equipment and software are often found in the thieves'
possession as they can be small and easily portable.

      c.  It is common practice for individuals involved in
identity theft, passport fraud, access device fraud, and money
laundering crimes to possess and use multiple digital devices at
once.  Such digital devices are often used to facilitate,
conduct, and track fraudulent transactions and identity theft.
Suspects often use digital devices to perpetrate their crimes
due to the relative anonymity gained by conducting financial
transactions electronically or over the internet.  They often
employ digital devices for the purposes, among others, of: (1)
applying online for fraudulent credit cards; (2) obtaining or
storing personal identification information for the purpose of
establishing or modifying fraudulent bank accounts and/or credit
card accounts; (3) using fraudulently obtained bank accounts
and/or credit card accounts to make purchases, sometimes of
further personal information; (4) keeping records of their
crimes; (5) researching personal information, such as social
security numbers and dates of birth, for potential identity
theft victims; (6) verifying the status of stolen access
devices; and (7) coordinating with co-conspirators.

      d.  Based on my training and experience, I know that
individuals who participate in identity theft, passport fraud,
access device fraud, and money laundering schemes often have co-
conspirators, and often maintain telephone numbers, email
addresses, and other contact information and communications
involving their co-conspirators in order to conduct their

business.  Oftentimes, they do so on their digital devices.
Suspects often use their digital devices to communicate with co-
conspirators by phone, text, email, and social media, including
sending photos.

e.   Individuals engaged in identity theft, passport
fraud, access device fraud, and money laundering schemes often
use multiple digital devices.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

35.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

36.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MBAT's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MBAT's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

39. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

//

## VII. <u>CONCLUSION</u>

40.   For all of the reasons described above, there is probable cause to believe that MBAT has committed a violation of Title 18, United States Code, Section 1542 (Use of a Passport Secured by False Statement).   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/ Douglas Choi

Douglas W. Choi, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this  21st day of March, 2021

THE HONORABLE GAIL STANDISH
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on March 19, 2021, and currently maintained in the custody of Homeland Security Investigations in Los Angeles, California:

        a.    A black Apple iPhone XR, IMEI: 3564331090500008 ("SUBJECT DEVICE 1");

        b.    A pink Apple iPhone 6S, IMEI: 355693071754702 ("SUBJECT DEVICE 2");

        c.    A black with gold case Apple iPhone, IMEI: 355829082069165 ("SUBJECT DEVICE 3");

        d.    A navy case Apple iPhone XR, IMEI: 356428108366066 ("SUBJECT DEVICE 4");

        e.    A black iPhone 12, IMEI: 35304011336194 ("SUBJECT DEVICE 5");

        f.    A purple with blue case Apple iPhone XR, IMEI: 356432106659191 ("SUBJECT DEVICE 6");

        g.    A Samsung Galaxy Note 8, IMEI: 351824091392017 ("SUBJECT DEVICE 7"); and

        h.    A metallic colored LG Phone ("SUBJECT DEVICE 8").

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 8, United States Code, Section 1326 (Illegal Alien Found in the United States Following Deportation), and Title 18, United States Code, Sections 1542 (Use of a Passport Secured by False Statement), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1028A (Aggravated Identity Theft), and 1956 (Money Laundering) (collectively, the "Subject Offenses"), namely:

a.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than Samuel Titus Mbat-Essien (MBAT), such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, passports, identification documents, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

c.    Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

d.    Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

e.    Any documents or records relating to any bank accounts, credit card accounts, digital currencies such as Bitcoin, the dark web, or other financial accounts;

f.    Contents of any calendar or date book stored on any of the digital devices;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

h.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

i.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written

communications sent to or received from any of the digital
devices and which relate to the above-named violations;

      k.  Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

      l.  Audio recordings, pictures, video recordings, or
still captured images of United States mail or mail matter,
whether opened or unopened, or relating to the possession or
distribution of drugs or the collection or transfer of the
proceeds of the above-described offenses; and

      m.  Any SUBJECT DEVICE which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offense/s, and forensic copies thereof.

      a.  With respect to any SUBJECT DEVICE containing
evidence falling within the scope of the foregoing categories of
items to be seized:

        i.  evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the

scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        h.  If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data

falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress Samuel Titus Mbat-

Essien's (MBAT's) thumb- and/or fingers onto the fingerprint
sensor of the SUBJECT DEVICES (only if the device has such a
sensor), and direct which specific finger(s) and/or thumb(s)
shall be depressed; and (2) hold the device in front of Samuel
Titus Mbat-Essien's (MBAT's) face with his or her eyes open to
activate the facial-, iris-, or retina-recognition feature, in
order to gain access to the contents of any such device.  In
depressing a person's thumb or finger onto a device and in
holding a device in front of a person's face, law enforcement
may not use excessive force, as defined in Graham v. Connor, 490
U.S. 386 (1989); specifically, law enforcement may use no more
than objectively reasonable force in light of the facts and
circumstances confronting them.

        6.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.